FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2022 JAN -5 PM 3: 45

DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA

v.　　　　　　　　　　　　　　　　CASE NO. 6:22-cr-02-ACC-DCI
　　　　　　　　　　　　　　　　　　　　　18 U.S.C. § 1349

HOLLY LYNN URBAN

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Bank Fraud)

**A. Introduction**

At times material to this Information:

1. HOLLY LYNN URBAN resided in Reunion, Florida, in the Middle District of Florida.

2. Helly Tec LLC was a limited liability company that Conspirator-1 formed in Florida, on or about June 21, 2017. The formation documents listed Conspirator-1 as the manager and registered agent of Helly Tec LLC. On or about September 18, 2017, Conspirator-1 removed himself and added HOLLY LYNN URBAN as the registered agent and manager of Helly Tec LLC. On or about May 28, 2019, HOLLY LYNN URBAN removed herself and added Conspirator-1 as the registered agent and manager of Helly Tec LLC. Conspirator-1 voluntarily dissolved Helly Tec LLC on or about June 12, 2019.

3. HFSG LLC was a limited liability company that HOLLY LYNN URBAN formed in Florida, on or about April 1, 2019. The formation documents listed HOLLY LYNN URBAN as the registered agent and manager of HFSG LLC. On or about October 21, 2019, HOLLY LYNN URBAN registered Conspirator-1 as the new registered agent of HFSG LLC. HOLLY LYNN URBAN remained the manager of HFSG LLC.

4. MMHFSG LLC was a limited liability company that HOLLY LYNN URBAN formed in Florida, on or about May 9, 2019. The formation documents listed HOLLY LYNN URBAN as the registered agent and manager of MMHFSG LLC.

5. Goshawk Optical LLC was a limited liability company that HOLLY LYNN URBAN formed in Florida, on or about July 3, 2019. HOLLY LYNN URBAN listed herself as the manager of Goshawk Optical LLC.

6. Doggo Enterprises LLC was a limited liability company that HOLLY LYNN URBAN formed in Florida, on or about February 17, 2020. The formation documents listed HOLLY LYNN URBAN as the sole authorized member of Doggo Enterprises LLC.

7. In or around March 2020, in response to the economic crisis caused by the novel coronavirus pandemic, the United States Congress passed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act"). Among other things, the CARES Act made available to qualified small businesses billions of dollars' worth of government-guaranteed loans, through

the Paycheck Protection Program (PPP). The purpose of PPP loans was to help small businesses that were suffering from the economic downturn to continue to pay salary or wages to their employees.

8. The PPP was administered by the Small Business Administration (SBA), which promulgated regulations concerning eligibility for PPP loans. Eligible businesses could apply for a PPP loan through a federally insured depository institution.

9. To qualify for a loan under the PPP, an applicant had to meet certain criteria including, among other things, that it (the business) was "in operation on February 15, 2020 and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." Moreover, the loan amount that could be approved under the PPP and implementing regulations typically was a function of the applicant's historical payroll costs. Accordingly, to obtain a PPP loan, the applicant was required to state, among other things, its average monthly payroll expenses and number of employees. The applicant was also required to provide documentation of the business's payroll expenses.

10. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, mortgage interest payments (but not mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or refinancing certain specified SBA

loans. The proceeds of a PPP loan were not permitted to be used to fund the borrower's ordinary day-to-day living expenses, or anything unrelated to the specified authorized expenses.

11. CenterState Bank of Florida ("CenterState Bank") and Customers Bank each were banks the deposits of which were insured by the Federal Deposit Insurance Corporation (FDIC). CenterState Bank and Customers Bank each therefore constituted a "financial institution" for purposes of 18 U.S.C. §§ 20 and 1344.

### B. The Conspiracy

12. Beginning on an unknown date, but at least as early as on or about April 10, 2020, and continuing through at least in or about May 2020, in the Middle District of Florida, and elsewhere, the defendant,

HOLLY LYNN URBAN,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States Attorney, to commit bank fraud: that is, to knowingly, and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds, credits, assets, and other property owned by, and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344.

### C. Purpose and Object of the Conspiracy

13. It was the purpose and object of the scheme and artifice for HOLLY LYNN URBAN and others known and unknown to the United States Attorney to fraudulently obtain moneys, funds, credits, assets, and other property owned by, and under the custody and control of a financial institution, namely, PPP loan proceeds, and to spend those proceeds on items that were not authorized under the PPP.

### D. Manner and Means of the Conspiracy

14. The manner and means by which the conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things, the following:

15. It was a part of the conspiracy that one or more conspirators would and did submit and cause to be submitted fraudulent PPP loan applications to CenterState Bank and Customers Bank on behalf of Helly Tec LLC, HFSG LLC, MMHFSG LLC, Goshawk Optical LLC, and Doggo Enterprises LLC (each a "COMPANY," and collectively, the "COMPANIES").

16. It was further a part of the conspiracy that one or more conspirators would and did knowingly include in the COMPANIES' PPP loan applications materially false and fraudulent representations and supporting documentation, including:

    a. False claims that a COMPANY had the average monthly payroll expenses stated in the application, when in truth and in fact, as the conspirators then

5

and there well knew, the COMPANY's actual average monthly payroll expenses were significantly lower, or entirely nonexistent.

  b. False claims that a COMPANY had the number of employees stated in the application, when in truth and in fact, as the conspirators then and there well knew, the COMPANY's actual number of employees was significantly lower, or entirely nonexistent.

  c. Fabricated documentation that purported to show a COMPANY's annual sales revenue, when in truth and in fact, as the conspirators then and there well knew, the COMPANY's actual annual sales revenue was significantly lower, or entirely nonexistent.

  d. Fabricated documentation that purported to list the names of employees of a COMPANY and timeframes in which those employees worked for the COMPANY, when in truth and in fact, as the conspirators then and there well knew, some or all of the listed employees had not worked for the COMPANY during the stated timeframes, if at all.

  e. Fabricated documentation that purported to list the payments made to employees of a COMPANY and the timeframes in which those payments had been made, when in truth and in fact, as the conspirators then and there well knew, some or all of the employees had not received the stated payments from the COMPANY during the stated timeframes, if at all.

   f. A false certification that a COMPANY was in operation on February 15, 2020, when in truth and in fact, as the conspirators then and there well knew, the COMPANY had ceased operation before February 15, 2020.

   g. A false certification that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule," when in truth and in fact, as the conspirators then and there well knew, the conspirators intended to use the PPP loan proceeds for unauthorized purposes, including to purchase FedEx routes for their personal enrichment.

   h. A false certification that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects," when in truth and in fact, as the conspirators then and there well knew, the information provided in the PPP loan application and supporting documentation and forms was not true and accurate in all material respects.

  17. It was further part of the conspiracy that one of more of the conspirators obtained proceeds of PPP loans issued to a COMPANY as a result of a materially false PPP loan application.

  18. It was further part of the conspiracy that the conspirators knowingly spent and attempted to spend those proceeds on numerous items that they knew were not authorized under the PPP, including personal credit card expenses and FedEx routes.

19. It was further a part of the conspiracy that one or more conspirators would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the scheme and the acts committed in furtherance of the scheme.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(2)(A).

2. Upon conviction of a violation of 18 U.S.C. § 1349, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

3. The property to be forfeited includes, but is not limited to, the following: (a) a money judgment in the amount of $632,000, which represent proceeds of the offenses; (b) approximately $50,000 seized from Tannehill, Carmean & McKenzie PLLC's account at Trust Mark National Bank, which was being held on behalf of Holly Urban and/or Hufer3 Inc.; and (c) approximately $67,845.66 seized from USAA Federal Savings Bank Account #7284-9 held in the name of Tomas Ziupsnys and Holly Urban, which fund were proceeds obtained from the bank fraud conspiracy.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

By: *[signature]*
Emily C. L. Chang
Assistant United States Attorney

By: *[signature]*
Ilianys Rivera Miranda
Assistant United States Attorney
Deputy Chief, Orlando Division